CAROLYN MANNO et al., Appellants, v GERARD LEVI et al., Respondents.

Second Department, July 11, 1983

APPEARANCES OF COUNSEL

*Spizz, Gans & Cooper* (*Harvey W. Spizz* and *Ilene Sherwyn Cooper* of counsel), for appellants.

*Dewey, Ballantine, Bushby, Palmer & Wood* (*Thomas C. Mazza* and *Sanford N. Berland* of counsel), for Eli Lilly and Company, respondent.

*Schiavetti, Begos & Nicholson* (*Michael B. Schad* of counsel), for Gerard Levi, respondent.

OPINION OF THE COURT

BROWN, J.

On these appeals we are faced, *inter alia,* with the application of the doctrine, last reaffirmed by the Court of

Appeals in *Matter of Steinhardt v Johns-Manville Corp.* (54 NY2d 1008, app dsmd 456 US 967), which holds that a cause of action based upon injuries sustained as the result of exposure to a deleterious substance accrues not at the time the injury becomes manifest, but, rather, when the substance is inhaled, ingested or injected. On constraint of that rule, we are compelled to conclude, despite our concern for plaintiff Carolyn Manno's (plaintiff) predicament and the apparent injustice which the doctrine continues to effect in cases such as hers, that plaintiff, who in 1969 took the drug DES (diethylstilbestrol) on the advice of her physician to ensure the successful completion of her pregnancy and, allegedly as a result developed cancer some nine years later, is barred by the Statute of Limitations from bringing this action to recover for her injuries.

The facts are substantially undisputed. In 1967, at the age of 26, plaintiff began to undergo regular gynecological examinations in the office of defendant Dr. Gerard Levi, an obstetrician-gynecologist. In April, 1969, plaintiff became pregnant for the first time. During the course of her pregnancy, she began to experience problems, including severe bleeding, which, according to Dr. Levi, indicated the possibility of a miscarriage. He thereupon prescribed medication which he said would help prevent a miscarriage. She took 100 pills a month for six months until, on November 14, 1969, she gave birth to a daughter, Lynn. Following the birth, she continued her regular annual gynecological examinations and thereafter gave birth to two other daughters, Laura (born July 27, 1973), and Adrienne (born October 14, 1974). During each of these pregnancies she was cared for and treated by Dr. Levi, who also delivered the children. After Adrienne's birth, at plaintiff's request, Dr. Levi performed a tubal ligation so that she would bear no more children. Plaintiff thereafter continued her regular annual gynecological examinations with Dr. Levi.

In November, 1978, plaintiff became concerned about a painful lump in her left breast. Dr. Levi referred her to her family physician. The lump was found to be cancerous and, in December, 1978, plaintiff underwent a modified radical mastectomy of her left breast. After completion of her postoperative care, she returned for her annual visit to Dr.

Levi's office. Upon learning of her operation, he advised her to return twice yearly. Early in 1980, on one of her visits, plaintiff asked Dr. Levi whether the drug she had taken in 1969 was DES. He acknowledged that it was. In May, 1980, plaintiff began to develop severe back pain. In June, 1980, she had a positive bone scan, evidencing lesions in her thoracic spine. After 10 radiation treatments, she underwent a bilateral salpingo-oophorectomy (removal of both fallopian tubes and ovaries) for relief. By the fall of 1980, she began to experience new back pain. A bone scan administered in January, 1981 showed new areas of activity and lesions. Plaintiff is at present being treated for an estrogen related metastatic bone disease which has spread through her vertebrae to her right ribs and the right side of her skull.

Plaintiff and her husband, Samuel Manno, thereafter commenced the instant action against Dr. Levi and Eli Lilly & Company, the manufacturer and seller of the DES which she took in 1969. The complaint stated three causes of action against each defendant: (1) on behalf of plaintiff, against defendant Levi, alleging negligence and lack of informed consent; (2) on behalf of Samuel Manno, against defendant Levi, alleging medical expenses and loss of services and society; (3) on behalf of plaintiff, against defendant Levi, alleging negligent infliction of emotional distress (from fears that her daughter Lynn would develop reproductive cancer as a result of her prenatal exposure to DES); (4) on behalf of plaintiff, against defendant Eli Lilly and Co., on a theory of strict products liability; (5) on behalf of Samuel Manno, against defendant Eli Lilly & Co., alleging medical expenses and loss of services and society; and (6) on behalf of plaintiff against Eli Lilly & Co., alleging negligent infliction of emotional distress.

Dr. Levi thereupon moved for (a) severance of the action against him from that against Eli Lilly & Co.; (b) dismissal of plaintiffs' three causes of action alleged against him on Statute of Limitations grounds; (c) summary judgment and dismissal of the first two causes of action for lack of merit; and (d) dismissal of the third cause of action for failure to state a cause of action. After service of its answer, Eli Lilly & Co. moved to dismiss the three causes of action against it

on Statute of Limitations grounds and to dismiss the sixth cause of action for failure to state a cause of action.

Dr. Levi's motion came before Justice BURSTEIN at Special Term. By order entered September 9, 1981, Justice BURSTEIN granted the motion, stating, *inter alia:*

"It is clear plaintiff's cause of action accrued in 1969 when she was prescribed and, indeed, used the drug DES. *Thornton v Roosevelt Hospital,* 47 NY2d 780 (1979); *Schwartz v Heyden Chemical Corp.,* 12 NY2d 212, remittitur amd. 12 NY2d 1073, cert den, 374 U.S. 808 (1963). Therefore, the applicable statute of limitations is three years, pursuant to CPLR 214 (6) prior to its amendment by L. 1975, c. 109, § 6. *Szajna v Rand,* 75 AD2d 617 (2d Dept 1980). This statute cannot be tolled on any theory of discovery, as chemical compounds (i.e. drugs) are not considered 'foreign objects'. *Thornton v Roosevelt Hospital, supra.* Further, the statute of limitations cannot be tolled under the 'continuous treatment doctrine', because the treatment here (the prescription and use of DES) both commenced and terminated during 1969. The continuation of the physician-patient relationship here was not related to the condition experienced by plaintiff in 1969, for which the drug had been prescribed. Thus, there has been no 'continuous treatment'. *Charalambakis v City of New York,* 46 NY2d 785 (1978); *Borgia v City of New York,* 12 NY2d 151 (1962). Should the claim of lack of informed consent be deemed a battery, rather than malpractice [see *Weinstein-Korn-Miller,* 1 NY Civ Prac § 214-(a).06.], an even shorter period is involved. See CPLR 215 (3).

"Finally, plaintiff requests that the doctrine of equitable estoppel should be applied here to prevent defendant from raising the statute of limitations as a defense. However, the amended complaint does not allege the requisite intentional fraud or fraudulent concealment on the part of defendant upon which an application of this doctrine can be based. See *Florio v Cook,* 48 NY2d 792 (1979); *Immediate v St. John's Hospital,* 48 NY2d 671 (1979); *Simcuski v Saeli,* 44 NY2d 442 (1978). The affidavits submitted also did not lend any factual support to such a claim. Accordingly, plaintiff's first cause of action must be dismissed as time barred.

"Even if defendant had notified plaintiff in 1969 or soon thereafter that she had taken DES, plaintiff had no known injury until 1978. Since the statute of limitations commenced to run in 1969, upon the introduction of the drug into her body, [*Thornton v Roosevelt Hospital, supra*], an action commenced even in 1978 would have been time barred."

The court also dismissed plaintiff's husband's derivative claim and his cause of action for emotional distress.

Eli Lilly's motion came before Justice McGINITY. In an order entered September 16, 1981, Justice McGINITY granted the motion upon the ground that the decision of Justice BURSTEIN was the law of the case. These consolidated appeals ensued.

Plaintiff contends, first, that her two subsequent pregnancies and her series of annual gynecological examinations constitute a continuous course of treatment sufficient to postpone the running of the Statute of Limitations.[1] The "continuous treatment" exception was originally set forth in *Borgia v City of New York* (12 NY2d 151, 155), where it was held that the time in which to bring a malpractice action is stayed "when the course of treatment which includes the wrongful acts or omissions has run continuously and is related to the same original condition or complaint". The Court of Appeals thus limited the doctrine to a continuous course of treatment related to the same original condition or complaint, for the same or related illness or injuries, continuing after the alleged acts of malpractice, but excluded those cases involving the mere continuity of a general physician-patient relationship. The rationale for the exception rests, in part, upon the principle that where a patient is being treated continuously for one condition, he or she should not have to interrupt that treatment in order to sue the physician; rather, the patient should be allowed to continue the treatment to its conclu-

---

1. Regardless of whether the continuous treatment doctrine applies, since the act complained of occurred in 1969, plaintiff's action is governed by the three-year Statute of Limitations for malpractice actions contained in CPLR 214 (subd 6) rather than the more recent two- and one-half year limitation period for medical malpractice actions accruing on or after July 1, 1975 (CPLR 214-a, L 1975, ch 109, § 6). The doctrine of continuous treatment does not alter the action's accrual date; it serves simply as a toll of the running of the Statute of Limitations (*McDermott v Torre*, 56 NY2d 399, 406-407).

sion, reposing trust and confidence in the physician, and the Statute of Limitations should not begin to run until that course of treatment has ended.

The New York courts have continued to elaborate upon the "continuous treatment" doctrine while applying it. In *Davis v City of New York* (38 NY2d 257, 259), for example, the court held that a patient's yearly checkup appointments for mammographies amounted to a series of discrete individual "treatments" and therefore did not constitute a "continuous course of treatment" sufficient to delay the running of the Statute of Limitations.[2] The *Davis* court further held that a series of mail and telephone contacts regarding the scheduling of an appointment did not constitute "treatment" (38 NY2d, at p 260). In *Fonda v Paulsen* (46 AD2d 540), the Third Department applied the "continuous treatment" doctrine to a situation in which, after operating on a patient, a physician continued to care for and observe him during postoperative visits, advising him that he had been cured, and the patient, complaining of pain in the same area, thereafter continued to return for further visits until the original allegedly faulty diagnosis was finally discovered. In *Charalambakis v City of New York* (46 NY2d 785, 787), the court, following *Borgia* (*supra*) and *Davis* (*supra*), held that a series of routine pediatric examinations did not constitute a "continuous course of treatment". And, most recently, in *Barrella v Richmond Mem. Hosp.* (88 AD2d 379), this court held that the "continuous treatment" exception would not apply to a situation where a patient interrupted her treatment in disregard of her physician's advice and then, eight and one-half months later, after she was admitted to the hospital under treatment by other physicians, her original physician visited her there and signed her discharge summary. The court found that this constituted a resumption and not a continuation of treatment.

On the basis of the foregoing cases and the legislative codification of the holdings thereof, it is thus clear that the

---

2. This principle was subsequently codified by the Legislature in CPLR 214-a (the medical malpractice Statute of Limitations which specifically excludes from the doctrine of continuous treatment "examinations undertaken at the request of the patient for the sole purpose of ascertaining the state of the patient's condition").

facts as alleged by plaintiff do not bring her within the purview of the "continuous treatment" exception to the Statute of Limitations in medical malpractice actions.

Plaintiff cites several other cases, distinguishable on their facts, arguing that Dr. Levi and, by extension, Eli Lilly & Co. (through Levi as intermediary), had a "continuing duty to warn" her regarding the dangers of DES, as those dangers became known, and that this duty delayed the running of the Statute of Limitations. In the first case cited, *Tresemer v Barke* (86 Cal App 3d 656), a California appellate court held that both a woman's physician and the manufacturer of the Dalkon Shield had a continuing duty to warn her of its dangers as new hazards were discovered, as long as the device which the physician had inserted remained in her body. In the second case referred to by plaintiff, *Doe v Anka Research* (US Dist Ct EDNY, Feb. 1, 1982, WEINSTEIN, J.), the court, citing *Tresemer v Barke* (*supra*), held that the continuing duty to warn in the case of a defective intrauterine device constituted a "continuous course of treatment" sufficient to delay the running of the Statute of Limitations under New York Law.[3] However, as defendant Lilly points out in its brief, both of these cases involved devices which continued to be present in the patient's body throughout the relevant period; here, however, plaintiff took DES during only one period in 1969 and, once she ingested the medication, the "treatment" in question ceased and the Statute of Limitations began to run.[4] Therefore, since plaintiff's allegations do not bring her within the purview of the "continuous treatment" exception, the Statute of Limitations began to run when the "treatment in question" ceased, that is, when plaintiff's daughter Lynn was born on November 14, 1969, or shortly thereafter when postoperative care ceased, and expired well before the commencement of this action.

---

3. The court's decision was apparently rendered from the Bench and is not otherwise reported. It is, however, summarized in the *New York Law Journal* (Feb. 3, 1982, p 1, col 2).

4. See, also, *Lindsey v Robins Co.* (91 AD2d 150), and *Reyes v Bertocchi* (92 AD2d 863), two recent decisions of this court holding that a cause of action for injuries resulting from a defective intrauterine device accrues at the outset of injury, not at the time of insertion. .

Plaintiff next contends that Eli Lilly & Co. may be held liable on the same basis as Dr. Levi. But even if we were to conclude that the "continuous treatment" exception was somehow applicable to Dr. Levi on these facts, it would not similarly make the action timely against Eli Lilly. Courts have extended the applicability of the "continuous treatment" doctrine to third parties not directly involved in the physician-patient relationship, such as consulting physicians, laboratories, and manufacturers, only under very limited circumstances. In *Fonda v Paulsen* (46 AD2d 540, *supra*), for example, the court held that a pathologist who misdiagnosed a biopsy specimen would be liable under the same "continuous treatment" theory as the primary physicians who treated the patient since, during the course of their treatment, they continued to rely on the pathologist's faulty diagnosis in assuring the patient that he did not have cancer. Thus it was reasoned that his misdiagnosis was as much a part of the continuing malpractice as the physician's continued reassurances. In *McDermott v Torre* (56 NY2d 399, *supra*), however, the Court of Appeals held that a pathology laboratory would not be liable on a "continuous treatment" theory for its misdiagnosis of a cancerous biopsy specimen where its action consisted of a one-time analysis and it had no continuing relationship, of an agency or any other nature, with the primary physician who continued to treat plaintiff for the condition in question. In *Holdridge v Heyer-Schulte Corp. of Santa Barbara* (440 F Supp 1088), the court, applying New York law, held that the "continuous treatment" exception would apply to the manufacturer of an inflatable mammary prosthesis in a case where the "continuous course of treatment" in question involved the fitting and continuing adjustment of the prosthesis in the patient's body by the physician, since the device was an integral part of the treatment. In *Lindsay v Ortho Pharm. Corp.* (637 F2d 87), however, in an action by a patient against both her physician and a manufacturer in connection with the continuing administration, over a period of years, of birth control pills, the Second Circuit Court of Appeals declined to follow *Holdridge* (*supra*), reasoning that it would rather await a ruling on the question by the New York Court of Appeals

before finding a pill's manufacturer liable under a "continuous treatment" theory. On the basis of these cases, there is no reading of the allegations present in the case before us under which Eli Lilly's role in the treatment of plaintiff can be said to have extended past the birth of Lynn on November 14, 1969. Thus, as to it, the Statute of Limitations began to run at that time and plaintiff's action is untimely.

Plaintiff contends, further, that Dr. Levi is estopped from raising the Statute of Limitations as a bar to her action because he knowingly concealed his malpractice from her and intentionally deceived her in order to prevent her from suing him. On the facts as alleged herein, this contention is without basis. In *Simcuski v Saeli* (44 NY2d 442), the Court of Appeals held that the defendant physician in a malpractice action might be equitably estopped from raising the Statute of Limitations as an affirmative defense where, through actual affirmative misrepresentations, he fraudulently concealed his malpractice from the patient by informing her that she was being cured (when in fact he knew this to be false), thereby causing her to continue her treatment with him in reliance on his advice and forego both seeking other treatment and suing him before the running of the Statute of Limitations. That same principle was thereafter applied in *Renda v Frazer* (75 AD2d 490), and *Krol v Valone* (80 AD2d 997). In *Simcuski (supra)*, however, the court indicated that there had to be specific allegations of such fraudulent concealment in the complaint, or at least evidence in the record that might support such allegations, before this principle could be applied. At bar, a reading of plaintiff's complaint and the papers submitted on the motions disclose no such allegation or evidence. The first cause of action against Dr. Levi contains no allegations that he actually knowingly concealed his malpractice or made fraudulent misrepresentations to plaintiff. Similarly, although plaintiff's affidavit seeks to imply that Dr. Levi deliberately concealed from her the fact that he had given her DES in 1969 when she informed him of her breast cancer and subsequent mastectomy, the allegations in the record do not in

any way indicate the kind of actual fraud necessary to create an equitable estoppel.

We come now to plaintiff's final contention, namely, that Special Term erred in dismissing her complaint as time barred on the basis of *Thornton v Roosevelt Hosp.* (47 NY2d 780). While we very much sympathize with plaintiff's predicament and are deeply concerned with the inequitable result which the doctrine enunciated in *Thornton* has worked in this case, we are constrained nonetheless to hold that that doctrine is applicable to and conclusive at bar. *Thornton* was predicated directly upon a long line of New York cases. In the leading case, *Schmidt v Merchants Desp. Transp. Co.* (270 NY 287), an action was commenced to recover damages for injuries sustained as a result of the inhalation of deleterious dust in the course of the plaintiff's employment. The court held that a cause of action for damages suffered as a result of exposure to a harmful substance accrues, and the Statute of Limitations begins to run, when the last exposure occurs, even though the actual injury may only become manifest many years later. Writing for a unanimous court, Judge LEHMAN reasoned (pp 300-302):

"We have said that 'in actions of negligence damage is of the very gist and essence of the plaintiff's cause.' (*Comstock* v. *Wilson,* 257 N. Y. 231, 235.) Accordingly, the plaintiff claims that his cause of action accrued, not at the time he inhaled the dust — more than three years before the action was commenced — but at the time when the dust, so inhaled, resulted in a disease of the lungs and that date, it is said, can be determined only by medical testimony.

"Though negligence may endanger the person or property of another, no actionable wrong is committed if the danger is averted. It is only the *injury* to person or property arising from negligence which constitutes an invasion of a personal right, protected by law, and, therefore, an actionable wrong. (Cf. 'The Duty to Take Care,' by W.W. Buckland, 51 Law Quarterly Review, p. 637; Pollock on the Law of Torts [12th ed.], p. 186.) Through lack of care a person may set in motion forces which touch the person or property of another only after a long interval of time (Cf. *Ehret*

v. *Village of Scarsdale,* 269 N.Y. 198); and then only through new, fortuitous conditions. There can be no doubt that a cause of action accrues only when the forces wrongfully put in motion produce injury. Otherwise, in extreme cases, a cause of action might be barred before liability arose.

"That does not mean that the cause of action accrues only when the injured person knows or should know that the injury has occurred. The injury occurs when there is a wrongful invasion of personal or property rights and then the cause of action accrues. Except in cases of fraud where the statute expressly provides otherwise, the statutory period of limitations begins to run from the time when liability for wrong has arisen even though the injured party may be ignorant of the existence of the wrong or injury. Consequential damages may flow later from an injury too slight to be noticed at the time it is inflicted. No new cause of action accrues when such consequential damages arise. So far as such consequential damages may be reasonably anticipated, they may be included in a recovery for the original injury, though even at the time of the trial they may not yet exist. When substantial damage may result from any wrong affecting the person or property of another, a cause of action for such wrong immediately accrues. (*Conklin* v. *Draper,* 229 App. Div. 227; affd., 254 N.Y. 620; *Wiener* v. *Ellrodt,* 268 N.Y. 646; *Capucci* v. *Barone,* 266 Mass. 578.)

"We must apply that rule here. The injury to the plaintiff was complete when the alleged negligence of the defendant caused the plaintiff to inhale the deleterious dust. For that injury, including all resulting damages the defendant was then liable. The disease of the lungs was a consequence of that injury. Its results might be delayed or, perhaps, even by good fortune averted; nevertheless, the disease resulted naturally, if not inevitably, from a condition created in the plaintiff's body through the defendant's alleged wrong. It cannot be doubted that the plaintiff might have begun an action against the defendant immediately after he inhaled the dust which caused the disease. No successful challenge could have been interposed on the ground that the action was prematurely brought because at the time it was com-

menced no serious damage to the plaintiff had yet developed. In that action the plaintiff could recover all damages which he could show had resulted or would result therefrom. In effect, the plaintiff is asking this court to hold that the statutory period of limitation begins only from the time that the plaintiff had reasonable assurance that serious damage had resulted or would result from past injury. The statute provides in unambiguous language that the period of limitation begins to run at the moment when right to begin an action accrues. The same test must be applied to a challenge that the action is stale as to a challenge that the action has been brought prematurely.

"The Statute of Limitations is a statute of repose. At times, it may bar the assertion of a just claim. Then its application causes hardship. The Legislature has found that such occasional hardship is outweighed by the advantage of outlawing stale claims. The problem created by the slow onset of the disease of pneumoconiosis or silicosis has been considered by the courts of other jurisdictions. They have given to statutes of limitation their intended effect as statutes of repose and have held that a cause of action sounding in negligence accrues at the time when through lack of care by an employer, deleterious substances enter the lungs of an employee though the development of consequential damages may be long delayed. (*Brown* v. *Tennessee Consolidated Coal Co.* 83 S.W. Rep. [2d] 568; *Scott* v. *Rinehart & Dennis Co.*, 180 S.E. Rep. 276; *Piukkula* v. *Pillsbury Astoria Flouring Mills Co.*, 150 Ore. 304; *Michalek* v. *United States Gypsum Co.*, 76 Fed. Rep. [2d] 115.)"

*Schmidt (supra)* was followed by *Schwartz v Heyden Newport Chem. Corp.* (12 NY2d 212), in which an action was brought in 1959 to recover damages for a cancer which required the removal of plaintiff's eye in 1957. The cancer was allegedly the result of an injection plaintiff received in 1944 of a substance to aid in the taking of X rays. The court extended the *Schmidt* doctrine to the injection of a chemical into the body and held that the cause of action accrued at the time of injection rather than at the time the injury became apparent. The opinion by Judge BURKE reasoned (pp 216-219):

"A cause of action accrues upon the violation of a legal right. In certain cases growing out of the action for trespass, the right is to be free from direct invasions of person or property. The wrong is done, the right violated, and the cause of action complete when the invasion takes place, independently of any actual pecuniary damage. In such cases the right is not to be trespassed upon. Some rights, however, of lesser antiquity, growing out of actions on the case, are not rights against technical invasions, but rather rights not to be damaged under certain circumstances. In such cases the wrong itself is not actionable, the right not violated, and the cause of action nonexistent until damage takes place. (1 Cooley, Torts [4th ed.], § 46.)

"None of these views point to a discovery rule. They would indicate, however, that the action accrues only when there is some actual deterioration of a plaintiff's bodily structure. This is the reasoning of cases holding that the statute doesn't begin to run until the defendant's wrong harms the plaintiff. (*Gile* v. *Sears, Roebuck & Co.*, 281 App. Div. 95 [defective floor caused injury * * *]; *White* v. *Schnoebelen,* 91 N. H. 273 [1941], [statute held to run from date when lightning struck defectively installed lightning rod].) Since, then, the recognized damages in negligence cases are pain and suffering, loss of earnings and, we suppose, damage to the structure of the body, it is questionable whether any cause of action exists before these things actually happen. But Judge LEHMAN's view in the *Schmidt* case is right as we must assume that the dust immediately acted upon Schmidt's lung tissue.

"Since many of our holdings that the cause of action accrues upon the introduction of the harmful substance into the body are malpractice cases, we should note that our accrual rule in such cases developed through special doctrinal pressures to which negligence cases as such have never been subjected. Originally actions for malpractice were premised on the breach of an implied contract to use the standard of care expected of a professional and the breach of that implied promise gave rise to the action for malpractice. Accordingly, the early decisions held, in accordance with the usual warranty rule, that the statute commenced to run from the time of its breach, i.e., when

the act complained of took place. (*Pike* v. *Honsinger,* 155 N.Y. 201; *Capucci* v. *Barone,* 266 Mass. 578 [1929]; *Conklin* v. *Draper,* 229 App. Div. 227, 230, affd. 254 N.Y. 620, *supra; Ranalli* v. *Breed,* 277 N.Y. 630; *Golia v Health Ins. Plan of Greater N.Y.,* 7 N Y 2d 931.) Whether uncritical acceptance of a fading theory of the basis of malpractice liability has led us astray in computing the time of accrual of the cause of action is of prime importance here. If we adhere to our accrual rule in malpractice cases, after recognizing that they are essentially negligence cases, we see no escape from the conclusion that we should follow *Schmidt* in a classic negligence case.

"We should put aside the contention, often justifying abandonment of prior holdings, that social change or advancement in the sciences has so altered the subject matter upon which the law operates that a different result is called for. The insidious and 'inherently unknowable' nature of cancer and similar diseases was common knowledge in 1936 when *Schmidt* was decided. The affecting plea of a plaintiff who could not know he was being destroyed from within fell then upon ears no less sensitive to such appeals than those now hearing this case. To our minds, the adoption of and adherence to the accrual rule by the Judges of our court from 1930 onward renders the simple assertion 'it is unjust' inadequate.

"Considering the function of a Statute of Limitations as a device for repose, a potential defendant's equities are the same whether the plaintiff knows of his condition or not. Repose is as beneficial to society in the one case as in the other. While the plaintiff's equities are greater in one case, it was presumably pursuant to a determination that the interests of an occasional claimant were subordinate to society's interest in repose that resulted in the Statute of Limitations in the first place. The existence of a discovery provision in the fraud statute bespeaks a legislative judgment that only in fraud cases, by their very nature, were there a sufficient number of unknown wrongs to justify a departure from the general rule. Apparently the rarity of such unfortunate cases in other types of actions did not outweigh the disadvantages of imposing a possible exception to the grant of repose to every person and industry

who could be a potential defendant. It is hard to say for certain, but perhaps the possibility of feigned cases against unprepared defendants and the difficulties of proof in meritorious cases led to a decision that society is best served by complete repose after a certain number of years even at the sacrifice of a few unfortunate cases. Whatever the policy considerations, the recent amendment of the malpractice statute from two to three years (CPLR, § 214, subd. 6) makes it clear that the legislative choice was deliberately made in the face of strenuously advocated alternatives. (See 1942 Report of N.Y. Law Rev. Comm., pp. 141-143, recommending a discovery provision with an outside limit of six years. A similar recommendation was made in 1962. See N.Y. Legis. Doc., 1962, No. 65[C].)

"It is not without reason that change in this area has been thought by us to be the responsibility of the Legislature. Our court has no facilities to inquire into the incidence of hardship cases under the statute, nor the peculiarly legislative prerogative to balance the result of such an inquiry against the countervailing considerations of prudence and social tranquillity that are supposed to justify Statutes of Limitations. Moreover, how could we set limits to the right plaintiff would have us grant? Is it for a court to say that there shall be an outside limit of six years? If so, what of the fact that 15 years passed before plaintiff brought this action?"

In dissent, Chief Judge DESMOND, joined by Judge (later Chief Judge) FULD, argued (pp 219-220): "As the complaint stands, the limitation periods have run since the pleading says no more than that plaintiff did not learn of the dangerous qualities of the preparation until 1958, 14 years after the injection. From his brief and his oral argument, however, it seems that his theory of action is that the carcinogenic qualities of the injection were not discoverable by him until after the 1957 surgical operation. If that be the fact, it would be unreasonable and perhaps unconstitutional to hold that his time to sue expired before it was possible for him to learn of the wrong * * * Statutes (including limitation laws) are not to be construed so as to deny the right to sue for a common-law wrong * * * *Schmidt* v. *Merchants Desp. Transp. Co.* (270 N.Y. 287), if and to the

extent that it is inconsistent with these views, should be re-examined."

Which brings us to the *Thornton* case (*supra*). *Thornton* was an application of *Schwartz* (*supra*), on almost identical facts. The court there stated (47 NY2d 780, 781-782, *supra*):

"In this action sounding in strict products liability based on allegations that a thorium dioxide substance manufactured by defendant Testagar, Inc., and injected into decedent resulted in the onset of cancer, the cause of action accrued at the time of invasion of decedent's body, and not at the time the decedent's cancerous condition became apparent * * *

"It is well established in this State that when chemical compounds are injected into a person's body, the injury occurs upon the drugs introduction, not when the alleged deleterious effects of its component chemicals become apparent. (*Schwartz v Heyden Newport Chem. Corp.*, 12 NY2d 212, cert den 374 US 808.) Here, plaintiff's claim being interposed some 20 years after the decedent's injection — the date of injury — the action is time-barred, irrespective of whether the cause of action is couched in terms of strict products liability.

"Nor can we conclude that plaintiff may invoke the so-called 'discovery' rule. While in the context of medical malpractice an action may be commenced after discovery of a 'foreign object' in the body of a patient (CPLR 214-a; see *Flanagan v Mount Eden Gen. Hosp.*, 24 NY2d 427), it is important to note that, by statute, chemical compounds do not constitute 'foreign objects'. We decline the invitation to extend judicially the discovery rule to strict products liability actions. Such matter is best reserved for the Legislature, and not the courts."

Judge FUCHSBERG strongly dissented. In arguing that plaintiff's cause of action should not be held to have accrued until the injury actually occurred, he stated (pp 783-784): "Drugs with a latent or slowly evolving potential for harm are no longer unique. The bewilderingly broad spectrum of such products grows greater all the time. More and more, they compel their users to place blind reliance

on the care with which they are designed, tested, fabricated, marketed and administered. Characteristically, the dangers they carry are hidden; as often as not, the earliest indication of harm may not turn up until a point remote in time, the adverse effect meanwhile being unknown and perhaps even nonexistent. Good sense and good law therefore require, it seems to me * * * that the injured user not be foreclosed from having his day in court before he even has knowledge of any injury and certainly not before any injury has occurred."

Finally, and most recently, came *Matter of Steinhardt v Johns-Mansville Corp.* (54 NY2d 1008, app dsmd 456 US 967, *supra*). There, the court, faced with a factual situation similar to that in *Schmidt* (*supra*), continued to adhere to its holding therein, stating (pp 1010-1011): "Plaintiffs in these actions, asserting injuries caused by the inhalation of asbestos particles, each commenced his action more than four years after their or their decedents' last employment-related exposure to asbestos. In *Schmidt v Merchants Desp. Transp. Co.* (270 NY 287), where the plaintiff alleged that the inhalation of dust while in the defendant's employ caused him to contract the disease known as pneumoconiosis, this court held that the statutory period of limitations began to run when the plaintiff inhaled the foreign substance. This principle was later reaffirmed in *Schwartz v Heyden Newport Chem. Corp.* (12 NY2d 212, cert den 374 US 808), involving a compound inserted into the plaintiffs' sinuses for the purpose of making them more perceptible in x-ray examination. Accordingly, if this rule is still controlling, each of the causes of action brought by plaintiffs is barred by the Statute of Limitations. Plaintiffs now urge, however, that the Statute of Limitations applicable to their cases should not run from the date of the last exposure to the invading substance, but rather from the date on which the asbestos-related disease was or could have been discovered. We are unable to adopt this proposed standard, and we reaffirm the principle announced in *Schmidt* and followed in *Schwartz*. Only recently, in *Thornton v Roosevelt Hosp.* (47 NY2d 780), where it was alleged that a thorium dioxide substance manufactured by the defendant and injected into the deceased plaintiff resulted in the onset of

cancer, we held that 'the cause of action accrued at the time of invasion of decedent's body, and not at the time' the condition became apparent. There, we noted that further extension of the limited discovery provision contained within the CPLR (214-a) was a matter best reserved for the Legislature, and not for the courts. We believe it to be inappropriate and injudicious to intrude into an area best suited for legislative scrutiny."

Judge MEYER concurred on constraint of *Thornton* (*supra*). Again Judge FUCHSBERG vigorously dissented.

Significantly, prior to the decision of the Court of Appeals in *Steinhardt* (*supra*), the Legislature carved out of the *Schmidt* (*supra*) rule an exception for the so-called "Agent Orange" cases. Enacted in 1981 as CPLR 214-b (L 1981, ch 266, § 3, as amd by L 1982, ch 153, § 1 and L 1983, ch 358), the exception promulgates, for these cases alone, a "discovery" rule. The legislative findings upon which that statute was predicated bear attention:

"During the Vietnam era, over six hundred thousand New York state residents served our nation in Indo-China. A large number of these people were exposed to phenoxy herbicides. The legislature finds that there is credible scientific evidence that exposure to these toxic substances has caused serious physical disabilities. The legislature also finds that the citizens of this state who were exposed to these substances have been denied access to the courts.

"This legislature finds that at the time of the enactment of subdivision five of section two hundred fourteen of the civil practice law and rules, the legislature had been principally motivated by the desire to discourage 'belated litigation'. Belated litigation did not serve the interests of justice since protracted delays in litigating issues resulted in the failing memory of witnesses and the disappearance of evidence that was relevant and germane to such issues. It was never the intent of the legislature in imposing limitations, to foreclose the citizens of this state from prosecuting legitimate claims, provided such claims are diligently and expeditiously pursued. An exception to the general period of limitation rule is required when the

pathological effect of an injury occurs without perceptible trauma, and the victim is blamelessly ignorant of the cause of the injury.

"The legislature further finds that, in the interest of justice, the claims of veterans of the Vietnam era should not be prohibited by the holding that a cause of action accrues, and the statute of limitations commences to run from the 'date of injury'. The obstruction to the prosecution of legitimate claims by individuals who served in Indo-China should be remedied by a discovery statute of limitations.

"The legislature further finds that the compelling circumstances present indicate a strong moral obligation by the state to revive time barred causes of action that have accrued in favor of citizens of this state who served in the armed forces during the Vietnam era, and had been exposed to and had come in contact with toxic chemical substances, and suffered severe physical disabilities which were undetected or undiscovered until years later." (L 1981, ch 266, § 1.)

One leading commentator, reflecting on this legislation before the Court of Appeals decision in *Steinhardt* (*supra*) was handed down, noted optimistically that "Perhaps the Agent Orange legislation — with its invidious distinction between injuries caused by exposure to phenoxy herbicides and those caused by other noxious substances will impel the Court of Appeals to re-examine the strange doctrine that a cause of action may be time-barred even before the plaintiff could possibly know that he has a cause of action" (McLaughlin, 1981 Supplementary Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR 214-b, p 181, 1982-1983 Pocket Part). Following the *Steinhardt* decision (*supra*), this same commentator felt compelled to abandon any hope of judicial relief and cast his gaze toward the Legislature for a remedy (McLaughlin, 1982 Supplementary Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR 214-b, p 181, 1982-1983 Pocket Part).

Our analysis, therefore, constrains us to affirm the orders of Special Term. The ingestion of a pill is so analogous to the injection of a chemical substance or the inhalation of

dust as to render this case legally indistinguishable from those cited. The law as it now stands — restated by a majority of our State's highest court but 20 months ago — mandates that we decide this case against the weight of our profound sympathy.

O'CONNOR, J. P., NIEHOFF and RUBIN, JJ., concur.

Two orders of the Supreme Court, Nassau County, entered September 9, 1981, and September 16, 1981, respectively, affirmed, without costs or disbursements.