CARMAN GRELLET, as Mother and Natural Guardian of CARLA PINEDA, an Infant Also Known as CARMAN LETICIA ELIAS, Appellant, v CITY OF NEW YORK et al., Respondents.

Second Department, June 23, 1986

APPEARANCES OF COUNSEL

*Pegalis & Wachsman, P. C. (Ellen M. Saunders* of counsel), for appellant.

*Frederick A. O. Schwarz, Jr., Corporation Counsel (June A. Witterschein* and *Marvin R. Kwartler* of counsel), for respondents.

**OPINION OF THE COURT**

BRACKEN, J.

■ In this medical malpractice action, the issue for determination is whether the service of a notice of claim almost 10 years after the date of the alleged malpractice was timely by reason of the tolling provisions for infancy or the continuous treatment doctrine. Because we conclude that the time within which the notice was required to be served was not tolled, we affirm the order of Special Term which dismissed the action.

The infant whose injuries are in issue here was born on July 3, 1970, at the Elmhurst General Hospital which, at that time, was owned by the defendant City of New York and operated through the defendant New York City Health and Hospitals Corporation. Although the plaintiff alleged that the infant's neurological injuries resulted from negligent care and treatment rendered on the date of the delivery, the plaintiff did not serve a notice of claim until February 8, 1980, and the action was thereafter commenced by service of a summons and complaint on or about August 6, 1982. In their answer, the defendants interposed an affirmative defense that the action had not been timely commenced and was barred by the Statute of Limitations.

Following joinder of issue, the defendants moved to dismiss upon the ground that the plaintiff had failed to serve a notice of claim on behalf of the infant within the time prescribed by General Municipal Law § 50-e. The plaintiff opposed the motion and cross-moved for an order dismissing the affirmative defense. In a memorandum decision, Special Term held that the plaintiff's notice of claim had not been timely served, and that the time in which to apply for leave to serve a late notice had expired, thereby requiring dismissal of the action and rendering academic the issue of the Statute of Limitations defense. By order dated May 24, 1984, Special Term granted the defendants' motion to dismiss the action and denied the plaintiff's cross motion.

It is uncontroverted that the alleged malpractice in this case occurred on July 3, 1970, at or about the time of the infant's birth. Thus, pursuant to the provisions of General Municipal Law § 50-e (1) (a) the plaintiff was required to serve her notice of claim within 90 days of that date. Clearly, the service of the notice by the plaintiff on February 8, 1980, almost 10 years later, was untimely, and the action must therefore be dismissed unless the plaintiff establishes that the time for serving the notice was tolled, either by reason of infancy or by virtue of the continuous treatment doctrine.

Prior to its amendment in 1976 (L 1959, ch 814, amended by L 1976, ch 745, § 2), General Municipal Law § 50-e (5) permitted a court, in its discretion, to grant leave to serve a late notice of claim within a "reasonable time" after expiration of the 90-day period, but an application for leave to serve a late notice was required to be made "within the period of one year after the happening of the event upon which the claim [was]

based". Moreover, the tolls and extensions prescribed in CPLR article 2, including the tolling provision for infancy (CPLR 208), were inapplicable to this limitation period *(Cohen v Pearl Riv. Union Free School Dist.,* 51 NY2d 256, 261; *Matter of Martin v School Bd.,* 301 NY 233; *Winter v City of Niagara Falls,* 190 NY 198; *Soloff v Board of Educ.,* 90 AD2d 829, *lv denied* 59 NY2d 602; *Matter of Soto v Greenpoint Hosp.,* 76 AD2d 928, 929).

The 1976 amendment to General Municipal Law § 50-e (L 1976, ch 745, § 2, eff Sept. 1, 1976) ameliorated the restrictive provisions of the prior statute and rendered the circumstances permitting leave to serve a late notice of claim "far more elastic" *(Matter of Beary v City of Rye,* 44 NY2d 398, 407; *see also, Hamm v Memorial Hosp.,* 99 AD2d 638). As amended, the statute retains the prior requirement that the notice be served within 90 days after the claim arises (General Municipal Law § 50-e [1] [a]), but it permits late service of the notice during the "time limited for the commencement of an action by the claimant against the public corporation" (General Municipal Law § 50-e [5]), i.e., one year and 90 days (General Municipal Law § 50-i; *Matter of Beary v City of Rye, supra,* at p 408). Moreover, because the period specified in General Municipal Law § 50-e (5) within which a court may permit service of a late notice is completely coextensive with the Statute of Limitations governing an action against the public corporation, the time within which to apply for leave to serve a late notice is subject to the same tolling provisions applicable to the Statute of Limitations, including the tolling provisions for infancy (CPLR 208; *Cohen v Pearl Riv. Union Free School Dist., supra,* at p 259; *Yepez v County of Nassau,* 79 AD2d 1023, 1024). Thus, an application to extend the time for serving a notice of claim must be made not more than one year and 90 days after the claim arose, unless the Statute of Limitations has been tolled *(Pierson v City of New York,* 56 NY2d 950, 954).

In this case, the plaintiff may not avail herself of the more liberal provisions of the post-1976 statute. The amendment, which became effective on September 1, 1976 (L 1976, ch 745, § 2), is not applicable to claims which arose more than one year prior to its effective date; such claims have "passed beyond the power of judicial recall" *(Matter of Beary v City of Rye, supra,* at p 413). Thus, the timeliness of the plaintiff's service of her notice of claim must be determined on the basis of the prior law, which required that an application for leave

to serve a late notice of claim be made within one year after the event from which the claim arose, and which was not tolled by infancy. Measured by this standard, the service of a notice of claim on February 8, 1980, was untimely.

Having determined that the plaintiff's time to serve the notice of claim was not tolled by infancy in this case, we must next consider her contention that the service was timely by reason of the continuous treatment doctrine, for it is settled that, in a medical malpractice case, the 90-day period for serving a notice of claim, which runs from the date on which the claim arose (General Municipal Law § 50-e [1] [a]), is tolled by a continuous course of medical treatment relating to the same original condition or complaint *(McDermott v Torre,* 56 NY2d 399, 407; *Borgia v City of New York,* 12 NY2d 151; *see also, Marabello v City of New York,* 99 AD2d 133, 137, *appeal dismissed* 62 NY2d 942). It is the plaintiff's burden to establish the continuous nature of treatments which take place after the date of the alleged negligence *(Barrella v Richmond Mem. Hosp.,* 88 AD2d 379, 380; *see also, Blythe v City of New York,* 119 AD2d 615; *Ferrer v Methodist Hosp.,* 101 AD2d 806; *Brush v Olivo,* 81 AD2d 852, 853).

Although the plaintiff now challenges Special Term's application of the continuous treatment doctrine to the infant's treatment history, the facts for the most part are not in dispute. The infant was born at Elmhurst General Hospital on July 3, 1970, and it was on that date that, as the result of the defendants' alleged negligence, she allegedly suffered permanent neurological injury, resulting in mental retardation and cerebral palsy. She was discharged from Elmhurst General Hospital on July 10, 1970, and the hospital's discharge record contained a notation to the effect that no further treatment was needed. During the ensuing 20 months, the infant received periodic outpatient medical care, including treatment for an apparent heart murmur, at Roosevelt Hospital, a private facility, and, during that same period, she was treated on several occasions at the Elmhurst General Hospital emergency room for medical problems that were unrelated to the injuries caused by the alleged malpractice.

On February 29, 1972, the infant was admitted to Roosevelt Hospital for evaluation, and she remained there through March 13, 1972. During her stay at Roosevelt Hospital, the infant was diagnosed, for the first time, as suffering from psychomotor retardation. On March 17, 1972, four days after she had been discharged from Roosevelt Hospital, the infant

was seen as an outpatient at the pediatric clinic of Elmhurst General Hospital. Significantly, the purpose of this visit, i.e., for treatment of fever, vomiting and diarrhea, was unrelated to the infant's newly diagnosed retardation, although the hospital's record of the visit described the infant as "obviously retarded" and contained a suggestion that "perhaps" an ear, nose and throat evaluation should be made in order to assess the 20-month-old infant's speech difficulties.

Following this visit, and during the ensuing eight-year period culminating with the service of a notice of claim on February 8, 1980, the infant made numerous intermittent visits to Elmhurst General Hospital for emergency room treatment for unrelated injuries and illnesses, regular pediatric medical care and examinations and consultations related to her retardation. The intermittent nature of these visits is evidenced by the fact that on May 1, 1973, the infant was brought to Elmhurst General Hospital because she had exhausted the medication that had been previously prescribed by a hospital physician for treatment of an upper respiratory infection. Thereafter, the infant did not return to Elmhurst General Hospital until December 2, 1974, approximately 19 months later, when she was seen at the pediatric clinic. The hospital's record for that date contains the following entry: "4½ y. old, W[female], not seen here for a long time. Never w/ v for mental retardation here. Being seen by neurologist at Roosevelt Hosp., last seen there in March 1984. To be placed in special school for mentally retarded". Thus, it appears that, as of 1974, the infant was utilizing Roosevelt Hospital as the primary provider of treatment related to her neurological problems, and Elmhurst General Hospital was simply providing intermittent emergency and routine care, as needed, for problems which were, for the most part, unrelated to the injuries allegedly sustained at the time of her birth. Thereafter, during 1975, she received an electroencephalogram at Elmhurst General Hospital, the results of which were described as "abnormal". This was followed by an examination by the hospital's developmental evaluation clinic, which assessed the infant to be "a severely retarded child functioning at no more than one year of age", and placed her on medication subject to further monitoring. She was subsequently seen by the hospital's neurology department on June 4, 1975, October 8, 1975, and November 20, 1975, and on December 7 and 8, 1975, additional electroencephalograms were administered.

In January 1976, the infant was admitted to Elmhurst General Hospital as a result of increased seizure activity. Another electroencephalogram was performed on May 7, 1976, and she received another neurological examination on September 9, 1976. On February 28, 1977, the infant's neurological condition was again reviewed, and her medication was changed. After that date, she was seen at Elmhurst General Hospital several times between March and June 1977 regarding medical problems unrelated to her retardation and seizures. The infant's next visit to Elmhurst General Hospital occurred in November 1978, 17 months later, when she was admitted, through the emergency room, with a diagnosis of seizures and cerebral palsy. The infant was thereafter seen intermittently at Elmhurst General Hospital during 1979 through 1981 for a variety of ailments, including her neurological disorders. It is the plaintiff's contention on appeal that the infant received continuous treatment for those neurological disorders at Elmhurst General Hospital from the date of her birth at least through December 31, 1979 and, therefore, the service of a notice of claim on her behalf on February 8, 1980, was timely.

■ Upon the foregoing facts, we agree with Special Term that there is no basis for application of the continuous treatment doctrine. This judicially created rule, which has now been codified *(see,* CPLR 214-a; *Barrella v Richmond Mem. Hosp.,* 88 AD2d 379, 380, n 1, *supra),* is premised on the basis that "[i]t would be absurd to require a wronged patient to interrupt corrective efforts by serving a summons on the physician or hospital superintendent or by filing a notice of claim in the case of a city hospital" *(Borgia v City of New York,* 12 NY2d 151, 156, *supra).* The doctrine's rationale rests, in part, on the further premise that "the trust and confidence that marks the physician-patient relationship puts the patient at a disadvantage to question the doctor's techniques * * * and gives the patient the right to rely upon the doctor's professional skill without the necessity of interrupting a continuing course of treatment by instituting suit" *(Barrella v Richmond Mem. Hosp., supra,* at p 383; *see also, McDermott v Torre,* 56 NY2d 399, 408, *supra; Watkins v Fromm,* 108 AD2d 233, 238).

Consequently, where the relationship between the patient and the provider of treatment has been severed, or where continuing treatment for the same or related illness or injury,

after the alleged malpractice, has been terminated, the continuous treatment doctrine loses its efficacy; there is simply no reason for a patient to defer the commencement of legal action to recover damages for the alleged malpractice *(Watkins v Fromm, supra,* at p 239). Thus, in order to effectuate the purpose of the continuous treatment doctrine and, at the same time, to prevent a complete abrogation of the Statute of Limitations and the applicable notice of claim requirements, the doctrine is limited in two important respects.

First, continuous treatment may not be based solely on the finding of a continuing physician-patient or, as in this case, hospital-patient relationship *(McDermott v Torre, supra,* at p 405); and it is necessary that there be an ongoing course of treatment for the same or related illness or injury continuing after the alleged negligent act or omission *(Borgia v City of New York,* 12 NY2d 151, 157, *supra).* Visits concerning matters that are unrelated to the original condition, including visits for routine examination, do not implicate the continuous treatment doctrine *(Charalambakis v City of New York,* 46 NY2d 785; *Swartz v Karlan,* 107 AD2d 801, 804; *see also, Manno v Levi,* 94 AD2d 556, 560, *affd* 62 NY2d 888, *cert denied sub nom. Fleishman v Lilly & Co.,* 469 US 1192).

Second, the treatment for the illness or injury must, in fact, be ongoing and continuous. The continuous treatment doctrine "does not contemplate intermittent treatment where substantial gaps of time exist between consultations" *(Curcio v Ippolito,* 97 AD2d 497, *affd* 63 NY2d 967; *see also, Renda v Frazer,* 100 Misc 2d 511, 515, *affd* 75 AD2d 490). Once the provider of medical services considers the patient's treatment to have been completed and does not contemplate further examinations or treatments, the Statute of Limitations (and the time for service of a notice of claim) may begin to run, although a complete discharge of the patient will not preclude the application of the doctrine where the patient *timely* returns to the hospital or physician to complain and seek further treatment of the same condition for which treatment had initially been rendered *(McDermott v Torre,* 56 NY2d 399, 405-406, *supra; see also, Richardson v Orentreich,* 64 NY2d 896; *Gudmundson v Axelrod,* 57 NY2d 930). In the absence of such a timely return, i.e., soon after the initial treatment *(McDermott v Torre, supra,* at p 406), subsequent visits may be viewed as "intermittent rather than continuous medical services" *(Davis v City of New York,* 38 NY2d 257, 260). The existence of substantial

temporal gaps between visits or treatments serve to break the continuity which is essential for the application of the doctrine; each such medical service may be deemed to be discrete and complete *(see, Davis v City of New York, supra, at p 260; Barrella v Richmond Mem. Hosp., 88 AD2d 379, 384, supra),* and the latter visit may be viewed as a resumption of treatment rather than a continuation of the prior treatment *(Sherry v Queens Kidney Center, 117 AD2d 663; cf. Levy v Schnader, 96 AD2d 854).* Moreover, it is the rule in the Second Department that the continuous treatment doctrine is inapplicable where the interval of time between visits or treatments exceeds the applicable period of limitations *(see, Bennin v Ramapo Gen. Hosp., 72 AD2d 736; see also, Blythe v City of New York, 119 AD2d 615, supra; Sherry v Queens Kidney Center, supra; Swartz v Karlan, 107 AD2d 801, 803-804, supra; Barrella v Richmond Mem. Hosp., supra, at p 384).*

Viewed in this context, the treatment afforded to the infant at Elmhurst General Hospital for her neurological injuries and related disorders was plainly intermittent and constituted, for the most part, separate and discrete treatments. The existence of substantial temporal gaps between visits militates against the application of the continuous treatment doctrine *(Sherry v Queens Kidney Center, supra).* In particular, the infant was released from Elmhurst General Hospital on July 10, 1970, and no further treatment was contemplated at that time. Although she returned to Elmhurst General Hospital on several occasions for emergency room treatment that was completely unrelated to the injuries in question, the hospital did not undertake to render care and treatment related to the infant's neurological condition until March 17, 1972, at the earliest, more than 20 months after she had been released. Thereafter, the infant did not visit the hospital at all during the 19-month period between May 1973 and December 1974, and during the 17-month period between June 1977 and November 1978. In each instance, these intervals between treatments exceeded the applicable one year and 90-day Statute of Limitations *(see,* General Municipal Law § 50-i), thereby rendering the continuous treatment doctrine inoperative *(see, e.g., Bennin v Ramapo Gen. Hosp., 72 AD2d 736, supra).* Moreover, the remaining visits were, for the most part, sporadic and intermittent *(see, Curcio v Ippolito, 97 AD2d 497, affd 63 NY2d 967, supra; McDermott v Torre, 56 NY2d 399, supra; Davis v City of New York, 38 NY2d 257, supra).* In fact,

it appears that during much of the time in question, the infant was receiving treatment for her neurological disorders at other institutions having no nexus with Elmhurst General *Hospital (cf. Blythe v City of New York,* 119 AD2d 615, *supra; Cotto v City of New York,* 99 AD2d 748). Accordingly, the cause of action for medical malpractice arose on July 3, 1970, the date of the commission of the alleged acts of malpractice *(see, Davis v City of New York, supra,* at p 259; *see also, Watkins v Fromm,* 108 AD2d 233, 237, *supra; Marabello v City of New York,* 99 AD2d 133, 137, *appeal dismissed* 62 NY2d 942, *supra)* and, because the period in which to serve a notice of claim (General Municipal Law § 50-e [1] [a]) was not tolled pursuant to the continuous treatment doctrine *(McDermott v Torre, supra,* at p 407), the service of a notice of claim by the plaintiff in 1980 was clearly untimely, and the action was properly dismissed.

LAZER, J. P., NIEHOFF and KOOPER, JJ., concur.

Order of the Supreme Court, Queens County, dated May 24, 1984, affirmed, without costs or disbursements.